**Austin WALKER, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 85–547–C.

United States District Court, E.D. Oklahoma.

March 19, 1987.

John D. Boydston, Tulsa, Okl., for plaintiff.

Todd Henshaw, Jim F. Gassaway, Tulsa, Okl., Bill Wilson, Sapulpa, Okl., Harold M. Shultz, Muskogee, Okl., W.C. Bill Sellers, Paul McBride, Sapulpa, Okl., Patrick A. Williams, Tulsa, Okl., Roger Hilfiger, U.S. Atty., Muskogee, Okl., John Mantooth, Elder, Mantooth & Haxel, Purcell, Okl., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

H. DALE COOK, Chief Judge.

This matter came on for nonjury trial on January 5, 6, and 7, 1987. Plaintiff Austin Walker brings this action against the United States of America alleging negligence under the Federal Tort Claims Act.

Plaintiff alleges Rex Herren, in his official capacity as an employee with the Office of the Solicitor, Bureau of Indian Affairs, through the Department of Interior, engaged in legal malpractice in carrying out his statutory duty as an attorney representing Indians in their alienation of interests in restricted Indian lands. In particular, plaintiff alleges Rex Herren failed to fully inform him of all the circumstances surrounding the alienation of an oil and gas leasehold interest in his property and obtain the best possible price for the lease.

In response, the United States admits that the land in question is restricted Indian land and that Rex Herren is an employee of the Office of the Solicitor. The United States denies any negligence on the part of Rex Herren, and affirmatively pleads that plaintiff, Austin Walker, was contributorily negligent in accepting the offer tendered by Bristow Resources, Inc., and agreeing to waive his right to competitive bidding for the oil and gas lease on his land.

After considering the pleadings, testimony and exhibits admitted at trial, the briefs and arguments presented by counsel for the plaintiff and defendant, and being fully advised on the premises, the Court enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### A. Jurisdiction and Venue

1. This is a civil suit arising under the Federal Tort Claims Act of June 25, 1984, and this Court has subject matter jurisdiction in that the controversy raises a federal question, and the United States is a party defendant.

2. Venue is proper within the Eastern District of Oklahoma in that plaintiff resides within this judicial district near Vian, Oklahoma.

3. Plaintiff properly presented to the United States Department of Interior, Bureau of Indian Affairs his claim in accordance with the procedures set forth in the Federal Tort Claims Act and the claim was rejected. The required six-month period elapsed prior to filing his complaint.

### B. Background
### Identification of Relevant Persons

4. Plaintiff, Austin Walker, is a forty-seven year-old 7/8th Cherokee-Creek Indian. He is the sole owner of forty acres of land, inherited from his grandmother Jeanetta Yahola (Toney) a Creek Indian, Roll

No. NB–57. The land is restricted from alienation by certain Acts of Congress relating to the Five Civilized Tribes, and may not be sold or leased for oil and gas exploration except after proper state court approval.

5. The legal description of the land is: NW/4 of SW/4 of Section 28, T17N, R9E in Creek County, Oklahoma.

6. Austin Walker is a high school graduate from Sequoyah Vocational School. He attended courses in Automobile Mechanics at Oklahoma State Technical School located in Okmulgee, Oklahoma. He has been licensed as a building maintenance engineer in the City of Tulsa, Oklahoma and is a veteran of the United States Army with an honorable discharge after four years of service.

7. Rex E. Herren is an attorney licensed since 1974 by the State of Oklahoma to practice law. He was an employee of the United States Solicitor's Office located in Tulsa, Oklahoma from 1974 until 1981. In early 1981 he went into private practice for one and a half years and returned to the Solicitor's Office in August, 1982. During the first part of 1983 he was a "trial attorney" with that office, and in August 1983 he became the assistant regional solicitor. In his capacity as trial attorney and subsequently as assistant regional solicitor, Mr. Herren acted for and in behalf of the Secretary of the Interior for the United States to perform the statutory duties of the Secretary of Interior regarding the legal representation of members of the Five Civilized Tribes with respect to restricted interests in Indian lands in accordance with the federal laws and agency regulations.

8. Albert Kelly is an attorney licensed to practice law in the State of Oklahoma and was in private practice as a partner in the law firm of McMillan, Vassar and Kelly located in Bristow, Oklahoma at all times relevant to this action.

9. Harold Schultz is an attorney licensed to practice law in the State of Oklahoma. From June 1956 until April 1983 Schultz was employed by the Office of the Solicitor in Muskogee, Oklahoma as a trial attorney and subsequently as a field solicitor.

10. Phil Elias is the major stockholder and manager of Philco Petroleum Company and Bristow Resources, Inc. These corporations are principally located in Bristow, Oklahoma and are primarily engaged in the business of exploration, production and sale of oil and gas. The law firm of McMillan, Vassar and Kelly (principally Albert Kelly) was hired by Phil Elias to represent Bristow Resources, Inc. in its efforts to obtain an oil and gas lease on the subject property. He also employed Harold Schultz as a consultant to assist Kelly in obtaining the lease.

11. For the purpose of this case, it is stipulated between the parties that the law firm contacted a person having the identical name as that of plaintiff (referred to as the "first Austin Walker") and as was the customary practice filed, on behalf of the first Austin Walker, the petition for court approval. On February 10, 1983, the first Austin Walker was presented before the District Court of Creek County, Oklahoma in case No. FB83–5. At that proceeding such person falsely petitioned and testified under oath that he was the true owner of the subject land. Based on that testimony, the state court judge, Streeter Speakman, approved a lease for oil and gas exploration in favor of Bristow Resources, Inc. The lease was dated January 10, 1983. Albert Kelly signed the petition, appeared in court and conducted the proceedings as attorney of record for petitioner, as well as de facto representing Bristow Resources, Inc. Rex Herren appeared as the trial attorney for the petitioner on behalf of the Secretary of the Interior.

12. It is stipulated that the person (the "first" Austin Walker) who appeared and represented himself to be the owner of the subject land did not own the land and therefore the oil and gas lease approved by the Court on February 10, 1983 is void.

13. It is further stipulated that, thereafter, Bristow Resources, Inc. drilled four oil wells, the last such well being completed on August 14, 1983. The parties agree

that the production proceeds for each well are as follows:

Production from January, 1983 to September, 1983:

| | |
|---|---|
| Elias Shoppa # 2 | –0– |
| Elias Shoppa # 9 | $353,064.87 |
| Elias Shoppa # 11 | $ 10,628.36 |
| Elias Shoppa # 12 | –0– |
| TOTAL | $363,693.23 |

Production to January 1, 1986:

| | |
|---|---|
| Elias Shoppa # 2 | $ 46,719.21 |
| Elias Shoppa # 9 | $ 765,038.62 |
| Elias Shoppa # 11 | $ 65,523.81 |
| Elias Shoppa # 12 | $ 392,497.92 |
| TOTAL | $1,269,779.56 |

### Procurement of the Lease from Plaintiff

14. Friday, September 16, 1983 was Austin Walker's graduation day from Oklahoma State Technical School in Okmulgee. Graduation would require plaintiff to move out of the school dormitories; however, plaintiff had no immediate place to live nor did he have any money nor did he own a vehicle. Plaintiff therefore hitch-hiked to Muskogee, Oklahoma to the local office of the Bureau of Indian Affairs to check if the Bureau had received any money, on his behalf, from a grazing lease on his land. At the Bureau, Mary Downing inquired of plaintiff if he had received any royalty payments from "that lease he signed". Due to plaintiff's lack of knowledge of the oil and gas lease, Mary Downing telephoned Rex Herren in Tulsa, Oklahoma. Rex Herren requested that plaintiff meet with him in his office in Tulsa.

15. Plaintiff hitch-hiked to the Solicitor's Office in Tulsa and met with Rex Herren. He showed Mr. Herren his driver's license and identification card issued by the Cherokee Nation. Together they went to the United States Attorney's Office for the Northern District of Oklahoma. Plaintiff was informed by Rex Herren that the matter would be investigated and plaintiff thereafter left Tulsa and hitch-hiked back to Okmulgee.

16. Being satisfied that plaintiff was the true Austin Walker, Rex Herren checked a treatise to determine the legal status of the matter and then telephoned Judge Streeter Speakman and informed him that the lease approved by the court in case No. FB83–5 was probably invalid in that the true Austin Walker had been identified. The judge advised Rex Herren that he would notify the law firm of McMillan, Vassar and Kelly. Later on that same date, Rex Herren received three telephone calls from various members of that firm. In the second conversation placed by Albert Kelly, Rex Herren became aware that there was oil and gas production on plaintiff's property. In the third conversation, Rex Herren, at the request of the law firm, informed the firm how to locate the plaintiff.

17. On the following Monday, September 19, 1983, Veta Germane, a landman employed by Bristow Resources, Inc., located plaintiff at the vocational school in Okmulgee. She asked him if he needed money and if he wanted to lease his Creek County land. When he informed her that he did, she offered him $500.00 for his signature on a document in which he agreed to convey to Bristow Resources an oil and gas lease on his property. By the terms of the lease, plaintiff was to receive a bonus of $100.00 per acre (or $4,000.00) plus a 3/16 royalty interest. At this meeting Veta Germane did not inform plaintiff that there was substantial oil and gas production on his land, although she was aware of the production.

18. On this same date, plaintiff went back to Tulsa to the Solicitor's Office. He showed Mr. Herren the $500.00 check, told him what had transpired, and asked Herren if he could cash the $500.00 check. Mr. Herren advised plaintiff that he could cash the check but that he would be required to reimburse Bristow Resources, Inc. if the lease was not approved by the state court. Rex Herren did not inform plaintiff that there was current oil and gas production on his property, nor discuss whether the lease terms were fair and reasonable in light of the production, nor discuss the best possible price for the lease.

19. On September 22, 1983 Veta Germane and Harold Schultz (both of whom were employed by Bristow Resources, Inc.) went to Gore, Oklahoma, to the residence

of plaintiff's cousin where plaintiff was temporarily residing. They talked to plaintiff about voluntarily removing the restrictions on his land. Plaintiff would not agree to releasing the restrictions.

20. On September 27, 1983 Rex Herren received a telephone call from Harold Schultz. Herren testified Schultz made inquiry as to whether the restrictions on plaintiff's land could be voluntarily removed and whether Herren would be willing to waive competitive bidding. Upon Herren's negative replies, Schultz informed Herren he would be representing and advising plaintiff at the court approval hearing. Herren testified in Court that based on Schultz's statement, he relied on Schultz to represent Austin Walker rather than assume the duty himself. The Court finds that it was Rex Herren's statutory duty to represent Austin Walker's interest at the state court proceedings and it was negligence on Herren's part to rely on the representation by another, particularly since Harold Schultz was hired by Bristow Resources, Inc., the adversarial party. Rex Herren knew Schultz's loyalties were with Bristow Resources by his statements of his desire to have the restrictions removed without the necessity of a court proceeding. Such inquiry did put Herren on notice that Schultz could not adequately represent the best interests of the Indian regarding alienation of his restricted land.

21. On October 4, 1983 Veta Germane returned to Gore, Oklahoma to procure plaintiff's signature on the lease approval petition.

22. The Creek County District Court had a monthly routine and regular appearance docket for approval hearings on restricted Indian lands. If Austin Walker's petition had been routinely set on the court's docket, the hearing date would have been November 10, 1983. However, Austin Walker's case was given an accelerated special setting and was docketed for October 20, 1983. Plaintiff had no further contact with any person, including Rex Herren, regarding the lease from October 4 until October 20, 1983.

23. Rex Herren was at the Creek County Courthouse on October 13, 1983 and spoke to Judge Speakman regarding the Austin Walker hearing set for October 20, 1983. Herren testified Judge Speakman was aware of the oil production on plaintiff's land.

24. The petition for conveyance was prepared by Albert Kelly as attorney of record for Austin Walker, the petitioner. However, Albert Kelly was hired by Bristow Resources, Inc. to procure the oil and gas lease from Austin Walker. This represents a complete breakdown in the fundamental principles of legal representation. Bristow Resources and Austin Walker were in an adversarial position in that Walker would expect to receive the highest price possible for the lease, whereas Bristow Resources would attempt to acquire the lease at the lowest possible cost. The Court finds that Albert Kelly was nominally and ostensibly the attorney for Bristow Resources, Inc. but de facto attorney for Austin Walker. This recognized and customary procedure for commencing approval hearings creates an inherent conflict of interest by the attorney's apparent dual representation. This inherent conflict has been recognized by the then Regional Solicitor, Raymond Sanford, as reflected in a memorandum prepared by him and distributed to the trial attorneys (including Rex Herren); it contains the following language:

### V—ATTORNEY FILING THE PROCEEDING

The attorney who prepares and files the petition signed by the Indian owners holds himself out as the attorney for the petitioners. However, there is a possible or implied conflict of interest because he is normally requested by the individual or corporation seeking to purchase or lease the land involved, to prepare and file the proceedings. He will receive a fee for his services from the purchaser, who might be the individual or corporation that secured the signatures of the owners to the deed or lease, and the petition. He has the legal responsibility

to prepare all documents necessary in the proceedings, including a transcript of the proceedings if no court reporter is available. The *Trial Attorney has the responsibility to insure that the Indian owners are fully and completely protected in the proceedings.* (emphasis added).

The Court finds that the procedural aspects of the state court approval process are fatally flawed. There is no justification for the Department of Interior to permit this type of procedural masquerade wherein the government's trial attorneys know first-hand that the private attorneys filing these petitions are bought and paid for by the Indian's adversary, i.e. the private attorneys' fiduciary client. Simultaneously the same private attorneys appear to be representing the Indian. The unsophisticated Indian would be justifiably confused and would justifiably rely to his detriment on any guidance from the adversarial private attorney. Although Rex Herren testified he relied on Harold Schultz to represent Austin Walker, there was no evidence that Harold Schultz, at any time, did anything to represent, advise, counsel or assist Austin Walker. Austin Walker was unrepresented at the proceeding. It is the Department of Interior's responsibility to change this procedure. Until such time, the trial attorneys within the Office of the Solicitor cannot and must not solely rely upon representations made to them by the private attorneys to the exclusion of their independent judgment and responsibilities. To do so is negligence and a breach of their statutory duty to represent the best interests of their client—Indians within the Five Civilized Tribes who are title-holders of restricted Indian lands.

25. Upon receiving the state court petition Rex Herren telephoned John Deibel, an oil and gas consultant, requesting an appraisal of Austin Walker's land. Mr. Deibel advised Herren that since the land was producing oil and gas it "would take some time" to obtain the appraisal. Rex Herren then ceased any further efforts at obtaining an appraisal of the property. The Court finds that Rex Herren was negligent in not procuring an appraisal of Austin Walker's property. The Court received testimony by Sharon Blackwell and Deborah Cain, both trial attorneys with the Solicitor's Office in Tulsa, and Raymond Sanford, former regional solicitor, that one of the primary and routine responsibilities of a trial attorney in such circumstance is to obtain an appraisal of the property. The appraisal then becomes the basic fact supplied to the court for its consideration and determination as to the reasonableness of the price offered the Indian for an interest in his land. If the trial attorney cannot obtain an appraisal within the ten-day time period allotted, then it is the duty of the trial attorney to move for a continuance of the approval hearing until such time that an appraisal can reasonably be obtained. The failure to move for a continuance under these circumstances is negligence.

### The State Court Proceeding

26. On October 20, 1983 Veta Germane drove to Gore, Oklahoma to give Austin Walker a ride to Sapulpa, the location of the District Court of Creek County, Oklahoma. During the drive, Veta Germane mostly discussed the weather. They arrived at Sapulpa at noon and had lunch together. She then took him to the courthouse at 1:00 p.m. Plaintiff stood in the hallway of the courthouse for almost thirty minutes. Rex Herren arrived at the courthouse around 1:00 p.m.; but rather than conferring with plaintiff, Herren went to Judge Speakman's chambers. Plaintiff testified that he was confused and nervous and primarily spoke to Ms. Germane about the procedure the court would follow. During this time Albert Kelly introduced himself to plaintiff. As 1:30 approached, plaintiff went into the courtroom. He recognized Harold Schultz and sat next to him. He tried to ask Schultz some questions, but Schultz ignored him. Albert Kelly approached Austin Walker, spoke to him about two or three minutes to inform him what he was to say when he took the witness stand. Kelly told Walker that he would be asking him questions regarding his ancestry and heirship. Next, Rex Herren entered the courtroom. Austin Walker

saw him and they left together to converse briefly in the outer hallway. Rex Herren informed plaintiff that he did not have a current appraisal of his property, but showed plaintiff the earlier one which was prepared *prior* to the production of oil and gas on the land. Rex Herren told plaintiff that he had the option to have the lease offered for competitive bidding, but that the price offered to him by Bristow Resources, Inc. was a fair price. Plaintiff therefore waived competitive bidding. At no time prior to or during the court proceedings was Austin Walker informed by anyone that there was substantial oil and gas production on his property.

27. At commencement of trial, Rex Herren announced his appearance as follows:

I am Rex Herren, Trial Attorney with the United States Department of Interior, appearing for the Secretary of Interior today pursuant to Section 4 of the Act of August 4, 1947, representing those individual Indians owning a restricted interest subject to today's proceeding.

Rex Herren did not question Austin Walker during the proceedings or participate in any manner. Rex Herren testified that he permitted Harold Schultz to assume the role of representing Austin Walker because he believed it was discretionary as to whether Herren or Schultz assume such duty.

28. From reading the transcript of the hearing, the Court finds the only questions asked of plaintiff related solely to his heirship and ancestry. Austin Walker's only responses were "yes", he did not testify; he merely confirmed Albert Kelly's testimony. There is no reference to oil and gas production on the land. There is one hint in the transcript, but it is not as to production, but only as to "improvements", on the property. This testimony could not adequately inform the judge of the true fair market value of the proposed lease. The proceedings were grossly inadequate. Every person in the courtroom on October 20, 1983, except for Austin Walker, knew there was substantial oil production on plaintiff's land. Rex Herren had the statutory duty to openly advise the court of all relevant information, including the presence of at least two substantially producing wells on the property, recommend competitive bidding if the price offered was plainly unreasonable, move for a continuance to obtain an appraisal or recommend the offered price be rejected by the court. The trial attorney has the duty to fully advise his client and openly advise the court of all matters within his knowledge, or get out of the courtroom thereby allowing an attorney in the courtroom who will properly represent the interest of the Indian in the alienation of his restricted Indian land.

## Post-State Court Proceeding

29. At the conclusion of the hearing and upon the court's approval of the lease, Austin Walker inquired where he could cash the $4,000.00 check tendered under the lease. He was told Phil Elias would cash the check for him in Bristow, Oklahoma. Veta Germane transported Austin Walker to the office of Bristow Resources, Inc. where he was met by Phil Elias. Without informing plaintiff of its meaning or consequences, Elias requested that plaintiff sign a Bill of Sale. Rex Herren was not present during this time. The Bill of Sale transferred to Bristow resources, Inc. $363,693.23 in escrowed funds. These funds represented the proceeds from the sale of oil and gas production from plaintiff's property from January 1983 to September 1983. The Court finds that Rex Herren's duty to represent Austin Walker was limited to appearing and properly representing Austin Walker at the state court proceedings. Rex Herren's statutory duty did not extend beyond the conclusion of the approval hearings. The facts indicate that it was *after* the conclusion of the judicial proceedings that Austin Walker met with Phil Elias at Bristow and his signature was procured on the Bill of Sale. Rex Herren had no statutory duty to stay with Austin Walker to see him safely home or to determine what he would do thereafter. The signing of the Bill of Sale was not related to the judicial process nor did it need court approval to be valid.

## Production

30. At trial evidence was offered that between March 7, 1983 and August 11, 1983 Bristow Resources, Inc. drilled four wells on plaintiff's land known as the Nos. 2, 9, 11 and 12. Well No. 9 had produced 10,814.37 barrels of oil between July and September 30, 1983. During October, 1983, 1,139.10 barrels were produced. This averages 3,613.79 barrels per month for three months or 11,980.47 barrels for four months with an average of 2,995.12 barrels of oil per month.

31. With full knowledge of the substantial oil production on plaintiff's land Bristow Resources, Inc. offered Austin Walker a bonus of $100.00 per acre plus a 3/16 royalty interest, without informing Austin Walker that there was oil production on his property.

32. At trial the United States offered three separate expert opinions regarding the fair market value of the lease as of October 20, 1983. John Deibel, an oil and gas consulting engineer, testified that a bonus of $300.00 per acre ($12,000.00) plus a 1/5 royalty for a two or three-year lease would be a reasonable offer. The second expert Powell King, an appraiser with the Bureau of Land Management, opined that an estimated bonus value set at $240.00 per acre ($9,800) plus a 3/16 royalty interest would be a reasonable fair market value of the lease. The third expert witness Charles Robertson, with the Bureau of Indian Affairs, appraised the lease bonus value at $500.00 per acre ($20,000.00) plus a sliding scale royalty rate of 3/16 per well until the cost of drilling was paid off, then 6/16 for all production thereafter.

33. The Court finds the expert testimony offered by the government regarding the fair market value of the subject lease is incredible, unworthy of belief and not regarded by the Court as reasonable for its consideration in view of the substantial oil production on plaintiff's property.

34. Plaintiff offered the expert opinion of Donald Bolt, a registered engineer with Bolt Engineering Company. Donald Bolt testified that a bonus price of $689,368 plus a 3/16 royalty interest would have been equitable for both the buyer and seller on October 20, 1983. The United States did not offer any reasonably sound evidence to discredit plaintiff's expert witness' opinion and therefore the Court finds the testimony of Donald Bolt is uncontradicted.

## Conclusion

35. The Court finds defendant United States of America, through its authorized representative, Rex Herren, Assistant Solicitor under the authority of the Department of Interior, grossly negligent. Rex Herren breached his statutory duty to appear and represent Austin Walker regarding alienation of his interest in restricted Indian lands.

36. The Court further finds Austin Walker was not contributorily negligent. The United States argues Austin Walker was contributorily negligent in that he wanted to lease his property knowing there was no appraisal and knowing he could request competitive bidding; however, Austin Walker made these decisions without any knowledge of the potential value of his land. An attorney's duty cannot stop with following his client's desire; he must also use independent professional judgment as to his client's best interests. An attorney cannot abandon his professional judgment due to the requests of his uninformed client. The evidence clearly demonstrated that Austin Walker did not have any knowledge of the potential value of his lease and therefore could not be held contributorily negligent in waiving rights he otherwise possessed. The government's attorney could not abandon his duty due to the uninformed desires of his client.

37. The Court enters findings in this case solely as to the responsibility and liability of the United States of America under the Federal Tort Claims Act, and the adjudication in this case does not in any manner abrogate any other independent cause of action plaintiff Austin Walker may have against any other persons. In this regard, the Court makes no adjudication or findings as to the status of Bristow Resources, Inc. on plaintiff's land prior to the October 20, 1983 court proceeding.

The Court did not receive sufficient evidence at trial on the issue of whether Bristow Resources, Inc. was a trespasser on plaintiff's property; therefore, no findings are entered on this issue.

The Court makes no findings regarding the first Austin Walker or his alleged participation in the February 1983 state court proceeding in which Bristow Resources, Inc. allegedly acquired an oil and gas interest in plaintiff's property.

Further, the Court does not enter any findings or conclusions regarding the participation of any other persons involved in the October 20, 1983 state court proceeding. This Court declined to accept jurisdiction over other private persons as "pendent parties" in that plaintiff's alleged claims against other private persons were different and separate causes of action and unrelated to liability arising under the Federal Tort Claims Act, as more particularly enumerated by the Court in its Order dated May 28, 1986.

## CONCLUSIONS OF LAW

### Jurisdiction and Venue

1. This Court has jurisdiction in that this case involves a federal question arising under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. and in that in this case the United States is a party defendant, 28 U.S.C. § 1346.

2. Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(e).

3. Plaintiff exhausted his administrative remedies as required by 28 U.S.C. § 2675.

### Liability of the United States

4. Congress reserved to itself the right to declare certain lands belonging to the Five Civilized Tribes to be inalienable unless a state court, within the jurisdiction in which the land is located, gives its approval of the sale. Indians are represented at the state court by attorneys under the auspices of the Department of Interior. These provisions for attorneys to appear on behalf of Indians having interests in restricted lands are set forth in the Act of May 27, 1908, ch. 199, Pub.L. 140, 35 Stat. 312 (1908), the Act of January 27, 1933, ch. 23, Pub.L. 323, 47 Stat. 777 (1933); and the Act of August 4, 1947, ch. 458, Pub.L. 336, 61 Stat. 731 (1947). Section 4 of the Act of 1947 states:

That the attorneys provided for under the Act of May 27, 1908 (35 Stat. 312), are authorized to appear and represent any restricted member of the Five Civilized Tribes in Oklahoma before any of the courts of the State of Oklahoma in any matter in which the said restricted Indian may have an interest.

5. Pursuant to these Acts, the following regulation was promulgated regarding legal representation of the Indians:

§ 16.3 Legal representation in State Courts.

The statutory duties of the Secretary to furnish legal advice to any Indian of the Five Civilized Tribes, and to represent such Indian in State courts, in matters affecting a restricted interest owned by such Indian, shall be performed by attorneys on the staff of the Solicitor, under the supervision of the Field Solicitor. Such advice and representation shall be undertaken to the extent that the Field Solicitor in his discretion shall consider necessary to discharge said duties, with due regard to the complexity of the legal action contemplated, the availability of staff attorneys for such purposes, the value and extent of the restricted interests involved, possible conflicts between Indians claiming to be owners of such interest, the preference of such owners concerning legal representation, the financial resources available to such owners, the extent to which such owners require similar legal services in connection with their unrestricted properties, and any other factor appropriate for consideration. 25 C.F.R. § 16.3 (1985)

6. The United States in carrying out its statutory duties holds a trust relationship with Indians. This trust relationship is delineated in Seminole Nation v. United States, 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942):

[T]his Court has recognized the distinctive obligation of trust incumbent upon

the Government in its dealings with these dependent and sometimes exploited people. (citations omitted). In carrying out its treaty obligations with the Indian tribes, the Government is something more than a mere contracting party. Under a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of this Court, it has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards. 316 U.S. at 297, 62 S.Ct. at 1054.

Trial attorneys within the Solicitor's Office hold a particularized fiduciary duty toward Indians they represent in state court proceedings respecting alienation of restricted Indian land. The government's attorney and the Indian have an attorney-client relationship with all the attendent legally imposed obligations that a fiduciary relationship creates. A breach of this duty is gross negligence.

7. In *Bailey v. Banister,* 200 F.2d 683 (10th Cir.1952) the court acknowledged where an Indian holds legal title to lands with a restriction against alienation, the title may be transferred only under rules and regulations proscribed by the Secretary of Interior or his authorized representative. In *Bailey* the court expressed that the United States has the duty to its ward "to obtain the best possible price for the property". The court opined that obtaining the best possible price is one of the reasons the government could withhold its approval of removing the restrictions on alienation, and lawfully intervene in and challenge the sale.

8. In *Gary v. Johnson,* 395 F.2d 533 (10th Cir.1968) cert. den, 392 U.S. 906, 88 S.Ct. 2056, 20 L.Ed.2d 1364 (1968) the court upheld the decision by the area director for the Secretary of Interior to withhold approval of a lease offered on restricted Indian land. The area director found that the lease was not in the best interest of the Indian and that the local Indian Office should have required competitive bidding to allow for the best possible price. The court acknowledged that the Indians rely on the government to look after their interests and will sign any papers which are submitted to them, sometimes without even reading them.

*Damages*

9. Rex Herren had the duty to appear at the state court proceeding, equipped with a current appraisal, and diligently represent Austin Walker regarding alienation of the proposed oil and gas lease. He had the duty to advise Austin Walker of the value of his lease by a current appraisal, or move for a continuance until the appraisal could be obtained. He had the duty to offer the lease for competitive bidding if the only outstanding offer was substantially lower than the appraised value. However, Rex Herren's duty concluded at the close of the approval hearing. From a reading of the plain words contained in the Act of 1947, the trial attorney is to "appear and represent", Indians at the judicial approval hearing and to advise the Indian regarding all aspects of the judicial proceeding. There is no indication from a review of the legislative history that Congress intended government attorneys to maintain an attorney-client relationship with the Five Civilized Tribe members for all their business dealings. Matters which occurred outside the presence of Rex Herren, without his knowledge, and outside the scope of his duties as defined in the Act of 1947, are not matters for which the United States can be held liable.

10. The Act of 1908 imposed a broader scope of duties on attorneys acting on behalf of the Secretary of Interior than the more recent Acts:

> And said representatives of the Secretary of Interior are further authorized, and it is made their duty, *to counsel and advise all allottees,* adult or minor, having restricted lands *of all their legal rights* with reference to their restricted lands ... (emphasis added).

In the Act of 1933, the duty was framed more narrowly:

That it shall be the duty of the attorneys provided for under the Act of May 27, 1908 (35 Stat.L. 312), *to appear and represent* any restricted member of the Five Civilized Tribes before the county courts ... (emphasis added).

The language used in the Act of 1947 is slightly more narrow:

That the attorneys provided for under the Act of May 27, 1908 (35 Stat. 312) are *authorized to appear and represent* any restricted member of the Five Civilized Tribes ... (emphasis added).

The progression of Congressional enactments demonstrate an intent by Congress to restrict and narrow the duties of the government's attorney. The duty to "counsel" Indians having restricted lands "of all of their legal rights" which was contained in the Act of 1908 does not appear in the Act of 1947.

11. In *Gary v. Johnson*, supra, the court held that an Indian who is adversely affected by not having his lease offered for competitive bidding is entitled to the amount by which a competitively bargained-for lease would exceed the amount of the lease tendered.

12. Therefore the Court, having found that the fair market value of plaintiff's leasehold was $689,368.00 as of October 20, 1983, concludes that but for the negligence of Rex Herren, there is a reasonable probability that Austin Walker would have received $689,368.00 from a willing, informed buyer.

13. Under the formula set forth in *Gary v. Johnson*, supra, Austin Walker is hereby awarded the sum of $689,368.00, less the $4,000.00 received, as damages against the United States for negligence on the part of Rex Herren due to breach of his fiduciary duty to Austin Walker, a member of the Five Civilized Tribes, due to Herren's failure to adequately represent plaintiff at the state court proceedings regarding the alienation of restricted Indian lands.

The Court further concludes that the escrow proceeds in the sum of $363,693.23 are not recoverable against the United States in that Rex Herren had no statutory

or other duty to represent Austin Walker after the conclusion of the state court proceedings.

WHEREFORE, premises considered, it is the Order of the Court that the plaintiff, Austin Walker, is entitled to Judgment against the United States of America in the sum of $685,368.00 plus post-judgment interest from the date of this Order until paid, together with Court costs to be taxed by the Court Clerk.